**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| EDWARD M.-R., *by and through his Parents*, T.R.-M. and E.M., <br><br>         *Plaintiffs*, <br><br>    v. <br><br> DISTRICT OF COLUMBIA, <br><br>         *Defendant*. |

Civil Action No. 21-177 (RDM)

**MEMORANDUM OPINION**

Plaintiffs T.R.-M. and E.M. bring this action on behalf of their son, Edward M.-R., who has multiple disabilities, including Autism Spectrum Disorder and Attention Deficit Hyperactivity Disorder ("ADHD"), to challenge the adequacy of the education that Edward received while attending District of Columbia Public Schools ("DCPS"). Specifically, they contend that the Individualized Educational Programs ("IEPs") prepared on Edward's behalf were "insufficient to appropriately meet his needs for several years," Dkt. 18-1 at 3, and that, as a result, he was deprived of the free and appropriate public education ("FAPE") to which he was entitled under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.

After a hearing officer issued a determination denying Plaintiffs' administrative relief, Plaintiffs filed this suit. Both parties moved for summary judgment, Dkt. 29, Dkt. 35, and Magistrate Judge G. Michael Harvey, having been referred the case, issued a thorough and well-reasoned Report and Recommendation ("R&R"), recommending that the Court grant summary judgment to the District of Columbia on all claims, Dkt. 43. Plaintiffs objected to the R&R on

1

several grounds, and it is those objections that are before the Court.  Dkt. 44.  For the reasons that follow, the Court will **ADOPT** the R&R and will **GRANT** summary judgment in favor of the District on all claims.

## I. BACKGROUND

### A.    Statutory Background

Congress enacted the IDEA to "ensure that all children with disabilities have available to them a free appropriate public education."  20 U.S.C. § 1400(d)(1)(A).  To that end, "the IDEA mandates that states receiving federal educational funding, including the District of Columbia, . . . establish 'policies and procedures to ensure,' among other things, that a 'free appropriate public education' ('FAPE') is available to children with disabilities."  *Herrion v. District of Columbia*, No. 20-3470, 2023 WL 2643881, at *1 (D.D.C. Mar. 27, 2023) (quoting 20 U.S.C. § 1412(a)).  The guarantee of a FAPE includes a promise to provide "special education and related services designed to meet [a child's] unique needs and [to] prepare [the child] for further education, employment, and independent living."  *Id.* (quoting 20 U.S.C. § 1400(d)(1)(A)).

Mechanically, the provision of a FAPE works through the creation and administration of an "individualized education program," or "IEP."  20 U.S.C. § 1414(d)(2)(A).  The IEP is "the centerpiece of the statute's education delivery system for disabled children."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  A child who is eligible for special education and services under the IDEA receives an IEP that sets forth "a comprehensive statement of the educational needs of [the] . . . child."  *Leonard v. McKenzie*, 869 F.2d 1558, 1560 n.1 (D.C. Cir. 1989) (quoting *Sch. Comm. of the Burlington v. Dept. of Educ.*, 471 U.S. 359, 368 (1985)).  "Prepared by an 'IEP Team'—composed of the child's parents or guardians, the child's teacher, a representative of a

local educational agency and, whenever appropriate, the child"—an IEP "sets out the child's present academic and functional performance, establishes measurable academic and functional goals for the child, and states the special education and related services that will be provided for the child." *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 121 (D.D.C. 2018) (citing 20 U.S.C. § 1414(d)(1)(A), (B)). "The IEP Team must review the child's IEP at least annually and may revise it as appropriate to address the child's anticipated needs." 20 U.S.C. § 1414(d)(4)(A).

"To assist in determining whether a student 'is a child with a disability' and in developing 'the content of the child's [IEP],' a local educational agency must conduct an 'initial evaluation' using 'a variety of assessment tools and strategies to gather relevant functional, development, and academic information, including information provided by the parent, that may assist in [making the relevant] determin[ations].'" *Herrion*, 2023 WL 2643881, at *2 (alterations in original) (quoting 20 U.S.C. § 1414(b)(2)(A)). "After the initial evaluation, each child must be reevaluated if the local educational agency determines it is necessary or if the child's parents or teacher request such a reevaluation." *Id.* (citing 20 U.S.C. § 1414(a)(2)(A)). "The reevaluation shall take place 'not more frequently than once a year, unless the parent and the local educational agency agree otherwise' and must be done 'at least once every three years' unless the parents and local educational agency agree it is unnecessary." *Id.* (citing 20 U.S.C. § 1414(a)(2)(B)).

The purpose of the IEP is to ensure that the child's substantive right to a FAPE is satisfied. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 201–04 (1982). "[A] child has received a FAPE, if the child's IEP sets out an educational program that is 'reasonably calculated to enable the child to receive educational benefits.'" *Endrew F. ex rel.*

*Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 394 (2017) (quoting *Rowley*, 458 U.S. at 207).  In other words, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 580 U.S. at 399.  "To the maximum extent appropriate," the school must educate the child in the "[l]east restrictive environment," which generally means "with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).

If the public agency fails to provide a child with a FAPE, the child's parents may file an administrative complaint, often referred to as a "due process complaint."  *Herrion*, 2023 WL 2643881, at *3 (citing 20 U.S.C. § 1415(b)(6)(B), (c)(2)).  "Whenever [such] a complaint has been received . . . [,] the parents . . . shall have an opportunity for an impartial due process hearing" conducted by the state or local educational agency.  20 U.S.C. § 1415(f)(1)(A).  "At that hearing, the parties may present evidence and elicit expert testimony about the child's educational and functional needs."  *Herrion*, 2023 WL 2643881, at *3 (quoting 20 U.S.C. § 1415(h)(2)).  In general, the hearing officer's decision "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education," although parents may also assert claims based on procedural violations.  20 U.S.C. § 1415(f)(3)(E)(i).  Parents "aggrieved by" the hearing officer's decision may seek review in the appropriate federal district court, "without regard to the amount in controversy," as Edward's parents have done here.  *Id.* § 1415(i)(2)(A); *see also Calloway v. District of Columbia*, 216 F.3d 1, 3 (D.C. Cir. 2000).

**B.     Factual Background**

Judge Harvey's R&R provides a thorough description of Edward's educational history and the events that led to this case.  *See* Dkt. 43.  The Court need not repeat that exposition here and, instead, summarizes only those facts relevant to Plaintiffs' objections to his R&R.

Edward was diagnosed with Autism Spectrum Disorder as a toddler and has received special education services from the District of Columbia ever since.  Dkt. 15-2 at 18 (A.R. 63).  He has also been diagnosed with ADHD.  *See* Dkt. 16-1 at 30 (A.R. 226).

In the fall of 2016, the DCPS performed a "psychological evaluation" of Edward as part of the triennial review process mandated by the IDEA.  *Id.* at 1 (A.R. 197).  That report describes Edward as "display[ing] variable below grade level academic achievement, Extremely Low cognitive skills, communications difficulties, social interaction/social skills deficits, atypical and stereotyped behaviors, and significantly distracted and off-task learning behavior."  *Id.* at 30 (A.R. 226).  The report also "notes marked impairment in age-appropriate communicative functioning, marked impairment in age-appropriate social functioning, and marked impairment in age-appropriate personal functioning."  *Id.*  Edward's parents and teacher reported that he "displays significant weaknesses in . . . initiating and sustaining attention, inhibiting impulsive responses, sustaining working memory, learning, planning, and organizing his environment/materials, difficulty with friendships, and poor/limited social skills."  *Id.*

The evaluator recommended "continued placement in a small structured academic and behavioral program that has a low student-to-teacher ratio and employs multiple presentation forms to include visual, auditory, kinesthetic and tactile modalities."  *Id.* at 31 (A.R. 227).  The evaluator also recommended that emphasis should be placed on increasing both his "functional literacy skills" as well as his "basic math skills (i.e., telling time, addition/subtraction, using

money).” *Id.* And, in light of Edward's difficulties with attention and working memory, the evaluator recommended “provid[ing] modeling and frequent repetition of material whenever possible” and “[p]roviding a visual chart of steps required to complete a task [to] serve as an external memory support.” *Id.*

During the 2017–2018 school year, Edward was enrolled as a fifth-grade student at Hearst Elementary School. *See* Dkt. 16-3 at 58 (A.R. 320). Edward's IEP for that year noted that he “received specialized instruction in the intermediate self-contained Communication and Education Support (“CES”) classroom.,” *id.* at 61 (A.R. 323), and directed that Edward receive, outside of the general education environment, 21.25 hours per week of specialized instruction, 4 hours per month of speech-language pathology, 2 hours per month of occupational therapy, 30 minutes per month of consultative services in occupational therapy, and 30 minutes per month of consultative services relating to behavioral support, *id.* at 76 (A.R. 338). Edward's final IEP Progress Report for that school year, dated June 8, 2018, reports that he had mastered his written expression goal and one of his math goals, two of his Motor Skills/Physical Development goals had not been introduced, and he was progressing on the rest. Dkt. 16-4 at 18–24 (A.R. 362–68).

The following school year, Edward moved to Deal Middle School for sixth grade. *See id.* at 33 (A.R. 377). His first IEP Progress Report at this new school, which still reported on Edward's achievement of the goals set forth in his 2017 IEP (his 2018 IEP had not yet been formulated), reflected that he had mastered the written expression goal (mirroring the prior Progress Report's results) and one of the reading goals. *Id.* at 39–43 (A.R. 377–82). The report also noted that he was progressing on both math goals (including the one he had been reported to have mastered at the end of the 2017–2018 school year), his Emotional, Social, and Behavioral Development goal and one of his Motor Skills/Physical Development goals. *Id.*

6

Edward's IEP team met to formulate his 2018 IEP on November 27, 2018.  *Id.* at 54 (A.R. 398).  The resulting 2018 IEP provided that Edward would continue to receive specialized instruction in the CES classroom and that he would now have a dedicated aide at Deal Middle School.  *Id.* at 67 (A.R. 411).  As did the 2017 IEP, the 2018 IEP provided that Edward would receive, outside of the general education environment, 21.25 hours per week of specialized instruction, 2 hours per month of occupational therapy, 30 minutes per month of consultative occupational therapy, and 30 mins per month of behavioral support services.  *Id.* at 72 (A.R. 416).  Edward's speech language pathology services were reduced from the 4 hours per month he received pursuant to his 2017 IEP to 3 hours per month in his 2018 IEP.  *Id.*  The 2018 IEP repeated one of the math goals and one of his reading goals from the prior IEP and added a new one in each category.  In non-academic areas, the Adaptive/Daily Living Skills goal from his prior IEP was repeated, as were his Communication/Speech and Language goal and his Emotional, Social, and Behavior Development goal.  The new IEP included three goals in Motor Skills/Physical Development, each of which was similar (but not identical) to the goals in his prior IEP.  *Id.* at 54–71 (A.R. 398–415).

In January 2019, Edward reported to one of his parents that another student receiving special education services had inappropriately touched him on the playground.  Dkt. 17-1 at 16–19 (A.R. 438–41).  Around that same time, Edward's teachers noticed that his "stimming ha[d] become more prominent" [1] and that he was having "increasingly severe challenges focusing during instructional lessons."  *Id.* at 8 (A.R. 430).  His teachers also noted that Edward had

---

[1]  Stimming is "a self-stimulatory behavior that is marked by a repetitive action or movement of the body (such as repeatedly tapping on objects or the ears, snapping the fingers, blinking the eyes, rocking from side to side, or grunting) and is typically associated with certain conditions (such as autism spectrum disorder)." Stimming, *Merriam-Webster's Collegiate Dictionary* (11th ed.).

"shown a drastic change in his ability to focus . . . to the point of forgetting some mastered skills such as adding two digit numbers, login information and regular routine such as getting all his things from his locker." *Id.* The teachers wanted to know if anything had "change[d] in the home" or if his medication had changed in a way that "may be a factor for the change in behavior." *Id.* Following the incident, Edward's parents asked that he be transferred to a different school, and the school granted that request.[2] *Id.* at 25–27 (A.R. 447–49).

Edward started at Hardy Middle School in early March 2019. Dkt. 15-1 at 18 (A.R. 18). According to his IEP Progress Report for the final period of the 2018–2019 school year, dated June 14, 2019, Edward was progressing on all his goals, with the exception of one Adaptive/Daily Living Skills goal that he mastered. Dkt. 19-6 at 20–24 (A.R. 1127–31).

In the fall of that year, Edward was evaluated once again, as required by the IDEA's triennial review process. Dkt. 17-2 at 1 (A.R. 505). That evaluation indicated that Edward's "basic reading skills," his "[f]luency, which is his ability to read[] statements to determine if they are true or false," and his "writing fluency and his ability to construct structured sentences using proper grammar and punctuation" were in the "Low Average" range. *Id.* at 8 (A.R. 512). His "[r]eading comprehension [was] considered a weakness." *Id.* And his "calculation skills, fluency, and applied problems" skills were "Very Low when compared to other students his age." *Id.* "Calculation was his highest performing area as it related to Broad Mathematics." *Id.* The evaluation noted that "Edward is a respectful and kind young man" who is "motivated to complete schoolwork," but stated that he "has difficulty maintaining nonverbal social behavior and primarily plays with adults." *Id.* at 5 (A.R. 509). Edward's performance was described as

---

[2] The school was notified of Edward's report to his parents, as were the police, though no charges were brought. Dkt. 17-1 at 16–19 (A.R. 438–41); Dkt. 21-5 at 120–21 (A.R. 1755–56).

"inconsistent," although "best when he has limited stimming behaviors." *Id.* The evaluation reported that "[h]e has difficulty focusing due to his stereotypy behaviors." *Id.*

Edward's IEP team met on November 25, 2019 to develop his 2019 IEP. *Id.* at 17 (A.R. 521). The 2019 IEP again provided that Edward would receive 21.25 hours per week of specialized instruction outside the general education environment, as well as 30 minutes per month of consultative occupational therapy, and 30 minutes per month of behavioral support services. *Id.* at 37 (A.R. 541). The 2019 IEP did, however, reduce the amount of speech-language pathology Edward would receive each month from 3 hours to 2 hours. His occupational therapy was also reduced from 2 hours per month to 1 hour per month. *Id.* Edward's 2019 IEP also repeated some of the goals from his 2018 IEP, but it added new goals for math, reading, Communication/Speech and Language, Emotional, Social, and Behavior Development, and Motor Skills/Physical Development. *Id.* at 20–37 (A.R. 524–41).

Edward's final IEP Progress Report for the 2019–2020 school year observed that he was progressing on all of the goals set forth in the IEP, except for one Emotional, Social, and Behavioral Development goal relating to self-advocacy, with respect to which he had made no progress relative to the prior reporting period. Dkt. 19-6 at 43–50 (A.R. 1150–57).

## C.    Procedural Background

Plaintiffs filed their administrative due process complaint on June 19, 2020. Dkt. 18-1 at 1 (A.R. 564). They alleged that the DCPS "has continuously failed to appropriately educate [Edward] as evidenced by his regression in multiple educational areas" and that Edward's "academic achievement scores have plummeted" since 2014. *Id.* at 3 (A.R. 565). Specifically, Plaintiffs challenged the adequacy of Edward's 2015 IEP, 2016 IEP, 2017 IEP, 2018 IEP, and 2019 IEP, noting that these IEPs "decrease[d] [his] speech/language therapy services,"

"increase[ed] . . . [his] time spent outside general education without [providing an]
accompanying increase in programmatic supports," and "cut[] [his] occupational therapy
services." *Id.* Plaintiffs also complained that the "goals and objectives" in those IEPs "d[id] not
clearly align with [Edward's] needs or present levels of educational performance," "[f]ail[ed] to
appropriately address significant needs in self-advocacy, social skills, programmatic language,
and functional academics," and "[f]ail[ed] to offer meaningful, research-based specially designed
instruction." *Id.* at 3–4 (A.R. 565–66). At a prehearing conference, the parties agreed that the
complaint raised the following issues:

> Did Respondent fail to offer the Student an appropriate Individualized Education
> Program ("IEP") in or about June[] 2015, December[] 2016, November[] 2017,
> November[] 2018, and November[] 2019? If so, did the Respondent act in
> contravention of 34 C.F.R. Sect. 300.320, *Endrew F. v. Douglas County School
> District*, 137 U.S. 988 (2017), *Hendrick Hudson Bd. of Educ. v. Rowley*, 458
> U.S. 176 (1982), and related authority? If so, did Respondent deny the Student
> a Free Appropriate Public Education ("FAPE")?

Dkt. 19-4 at 44–45 (A.R. 1014–15).

DCPS moved to dismiss the due process complaint to the extent it "alleged failure[s] to
develop appropriate IEPs" before June 2018 on the ground that any such violations occurred
more than two years prior to June 2020 and were thus barred by the IDEA's two-year statute of
limitations. Dkt. 18-2 at 2, 8 (A.R. 625, 631). Plaintiffs opposed the motion, arguing among
other things that Plaintiffs "did not have sufficient information to know of [the] DCPS's failure
to educate [Edward] until receiving updated testing data on November 23, 2019." Dkt. 19-4 at
46 (A.R. 1016). In light of the factual dispute underpinning the statute-of-limitations issue, the
hearing officer held an evidentiary hearing on August 19, 2020. *Id.* at 46–47 (A.R. 1016–17).
At the hearing, both parties introduced evidence and Edward's mother and a school psychologist

(who was qualified by the hearing officer as an "expert in reviewing student evaluation and assessment data and progress") testified. *Id.* at 47 (A.R. 1017).

In an order issued on September 4, 2020, the hearing officer found that Plaintiffs "knew or should have known about the alleged action that forms the basis of the complaint," 20 U.S.C. § 1415(f)(3)(C), when "the IEPs were created," Dkt. 19-4 at 60 (A.R. 1030). The hearing officer wrote:

> Petitioner[, Edward's mother,] contended that she did not know that the Student was faring poorly in school until 2019, when she requested that the Student be evaluated. . . .
>
> The record does not support Petitioner's allegations. To the contrary, the record shows that Parent knew that the Student had low academic levels and was struggling through the period in question. Notable is Witness A's psychological assessment from November 11, 2016, which included the results of an interview with Petitioner. During this interview, Petitioner told Witness A that her main concern was the Student's academic progress, social skill development, and safety, and that the Student could not understand what s/he read. The record also contains notations from a phone call from Teacher A to Parent on October 25, 2017. During this conversation, Petitioner mentioned that the Student's situation was "heartbreaking" because when she and the Student talked, "it sounds like [s/he is] doing so well, but [the] IEP says otherwise."
>
> Petitioner should have known the Student's cognitive and academic levels during this time. DCPS assessed the Student comprehensively in 2016, and prepared IEPs for the Student every year. . . . Every assessment, and every IEP, clearly indicated that the Student was functioning well below grade level in all academic subjects and had speech and language issues, though the Student performed better when asked to identify words. . . . The Student's IEPs during this period stated similar conclusions. The November 27, 2017, IEP and the November 27, 2018, IEP both indicated that the Student was functioning far below grade level in mathematics, writing, and reading comprehension, and also mentioned that the Student engaged in excessive motor-stereotypy and vocal-stereotypy in class. It is important to underscore that Petitioner did not clearly dispute Witness A's testimony that Petitioner had received the Student's IEPs and assessments at or near the time they were created.

*Id.* at 57–58 (A.R. 1027–28).  The hearing officer, accordingly, agreed with DCPS and dismissed those claims "relating to the IEPs of June[] 2015, December[] 2016, and November[] 2017."  *Id.* at 60 (A.R. 1030).

The hearing officer later held a due process hearing to adjudicate the remainder of Plaintiffs' remaining claims—that is, their challenges to Edward's November 2018 and November 2019 IEPs.  At that hearing, fifteen witnesses testified.  Twelve witnesses were called by Plaintiffs, including: Edward's mother; his special education teacher at Deal Middle School, Annie Mengistu; Local Education Agency ("LEA") representative for Deal Middle School, Arielle Alphonse; Edward's speech-language pathologist at Hardy Middle School, Lesa Gibson; and a school psychologist at Hardy Middle School, Arden Matthew.  DCPS called three witnesses, including Matthew, again, and a specialist with DCPS's autism team, Mark Walker.[3]

The hearing officer issued his final determination in October 2020.  He summarized the issues raised by Plaintiffs' claims that were not time barred as follows:  Did the DCPS fail to offer Edward "an appropriate IEP in or about" November 2018 and November 2019, and, in particular, were those IEPs inadequate because they "did not contain:" (1) "sufficient speech and language therapy and/or occupational therapy;" (2) "any or sufficient recommendations for staff to employ research-based programming within general education, outside general education, and/or during related services;" (3) "any or sufficient recommendations to address [Edward's] deficits in self-advocacy skills;" (4) "any or sufficient recommendations to address [Edward's] functional academic skills;" (5) "[]sufficient and []appropriate goals and objectives;" or (6) "any or sufficient recommendations to address [Edward's] social skills and pragmatic language."  Dkt.

---

[3] The other witnesses are not described here because their testimony does not factor into the issues presented by Plaintiffs' objections to the R&R.

15-1 at 7 (A.R. 7).  After describing the standard applicable to Plaintiffs' claims—namely, whether Edward's IEPs were not "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*, 580 U.S. at 399—the hearing officer determined that for each of Plaintiffs' claims, they had either "not present[ed] a prima facie case . . . or, alternatively," that the DCPS had demonstrated "that its recommendations for [Edward] were appropriate."  *Id.* at 26 (A.R. 26).

Plaintiffs filed this suit on Edward's behalf on January 20, 2021, alleging that "the [h]earing [o]fficer erred in finding that Edward's IEPs were appropriate and provided Edward with a FAPE" and "erred in insisting that" Plaintiffs present expert testimony at the due process hearing.  Dkt. 1 at 10 (Compl. ¶ 34).  Among other things, the complaint alleges that the IEPs were deficient because they did not consider Edward's "lack of educational progress," did not contain measurable goals, and did not "provide for research-based instruction in any areas of need."  *Id.* at 10–11 (Compl. ¶¶ 35–37).  Plaintiffs also challenge the hearing officer's decision to dismiss their claims that accrued prior to June 2018.  *Id.* at 7–8 (Compl. ¶ 28).  The Court referred the case on April 9, 2021, to Magistrate Judge Michael Harvey for an R&R, and on October 22, 2021 and December 17, 2021, respectively, the parties cross-moved for judgment on the administrative record, Dkt. 29, and for summary judgment, Dkt. 35.

On June 7, 2022, Judge Harvey issued his R&R.  The R&R first concludes that the hearing officer was correct in finding that the IDEA's two-year statute of limitations barred Plaintiffs' challenges to the June 2015, December 2016, and November 2017 IEP.  It then goes on to address each of Plaintiffs' challenges to the hearing officer's decision with respect to the November 2018 and November 2019 IEPs and concludes that the hearing officer correctly resolved each of these disputes.  Finally, the R&R concludes that Plaintiffs conceded that they

had advanced new arguments in their motion for summary judgment that were not presented to the hearing officer and are, therefore, not properly before this Court.  Dkt. 43.  Plaintiffs filed timely objections to all three of the R&R's conclusions.  Dkt. 44.

## II. LEGAL STANDARD

Once a magistrate judge issues a report and recommendation on a dispositive motion, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to" by the parties.  Fed. R. Civ. P. 72(b)(3); *see also Shurtleff v. U.S. Env't Prot. Agency*, 991 F. Supp. 2d 1, 8 (D.D.C. 2013) ("Proper objections 'shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for objection.'" (quoting Local R. Civ. P. 72.3(b))).  The Court reviews "only those issues that the parties have raised in their objections."  *Taylor v. District of Columbia*, 205 F. Supp. 3d 75, 79 (D.D.C. 2016) (quoting *Aikens v. Shalala*, 956 F. Supp. 14, 19 (D.D.C. 1997)).  And parties may not raise in their objections "new initiatives" that were not put before the magistrate judge.  *Id.* (citation omitted).  After reviewing a magistrate judge's recommendations and timely objections to it, the district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).

The R&R at issue here addresses Plaintiffs' motion for judgment on the administrative record and the District's cross-motion for summary judgment.  A party is usually entitled to summary judgment under Rule 56 if it can "show[] that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The summary judgment standard in an IDEA case, however, differs from the usual Rule 56 standard. Under the IDEA, the district court "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see also, e.g., Herrion*, 2023 WL 2643881, at *7.

In conducting its review, a district court "must give 'due weight' to the hearing officer's determinations," *Z.B. v. District of Columbia*, 888 F.3d 515, 523 (D.C. Cir. 2018) (quoting *Rowley*, 458 U.S. at 206), recognizing that "courts lack the 'specialized knowledge and experience' necessary to resolve persistent and difficult questions of educational policy" and so "must be careful to avoid imposing their view of preferable educational methods," *Rowley*, 458 U.S. at 208.  In addition, "a hearing officer's findings 'based on credibility determinations of live witness testimony' are given 'particular deference' where there is no supplementation of the record."  *B.B. v. District of Columbia*, No. 20-2467, 2022 WL 834146, at *5 (D.D.C. Mar. 21, 2022) (quoting *McAllister v. District of Columbia*, 45 F. Supp. 3d 72, 76–77 (D.D.C. 2014)); *accord A.G. v. District of Columbia*, 794 F. Supp. 2d 133, 141 (D.D.C. 2011) (noting that when the hearing officer makes "fact based, credibility-dependent finding[s], . . . a greater level of deference is often appropriate"); *J.N. v. District of Columbia*, 677 F. Supp. 2d 314, 322 (D.D.C. 2010) (same).

That deference, however, falls short of that which is "'conventional in administrative proceedings,' especially when the decision is insufficiently supported by fact or reasoning." *Z.B.*, 888 F.3d at 523 (quoting *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005)).  Therefore, "while a certain amount of deference should be accorded to the knowledge and expertise of the hearing officer," *M.O. v. District of Columbia*, 20 F. Supp. 3d 31, 40 (D.D.C. 2013), a hearing decision "without reasoned and specific findings deserves little deference," *Reid*, 401 F.3d at 521 (citation omitted); *see also Endrew F.*, 580 U.S. at 404 ("By

the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement.  A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions.").

"The party challenging the administrative decision carries the burden of proof of persuading the court that the [h]earing [o]fficer was wrong."  *B.B.*, 2022 WL 834146 at *5 (citing *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)).  "That party must demonstrate by a preponderance of evidence that the [h]earing [o]fficer erred."  *D.C. Int'l Charter Sch. v. Lemus*, No. 21-0223, 2023 WL 2645985, at *10 (D.D.C. Mar. 27, 2023) (citing *Kerkam*, 862 F.2d at 887); *see also Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) ("[A] party challenging the administrative determination must at least take on the burden of persuading the court that the hearing officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so." (quoting *Kerkam*, 862 F.2d at 887)).

### III. ANALYSIS

#### A.    Statute of Limitations

Plaintiffs first object to the R&R on the ground that it "erroneously applied [the] IDEA's statute of limitations as a matter of law."  Dkt. 44 at 3.  In particular, Plaintiffs maintain that both the magistrate judge and the hearing officer erred in barring them from recovering for any educational harm that Edward sustained "during the beginning of the 2018–2019 school year" because the November 28, 2017 IEP—which was still in effect at that time—"was drafted more than two years before the Due Process Complaint was filed."  *Id*.  This was error, in Plaintiffs' view, because the "educational harm," even if tied to the November 2017 IEP, occurred "within the two-year period before the filing of the Due Process Complaint."  *Id.* at 3, 5.

Plaintiffs' argument regarding the statute of limitations has evolved over time.  Before
the hearing officer, they argued that the IDEA's two-year statute of limitations did not start to
run until 2019, when they maintain that they first leaned that Edward "was fairing poorly in
school." Dkt. 19-4 at 56 (A.R. 1026).  The hearing officer rejected that theory as a matter of
fact, finding that Plaintiffs knew that Edward "had low academic levels and was struggling
through[out] the period in question." *Id.* at 57 (A.R. 1027).  In their summary judgment brief
before this Court, Plaintiffs acknowledged that the hearing officer had found that they knew or
should have known of the basis for their due process complaint on "the date of development of
each IEP itself" and that, as a result, their challenges to the June 2015, December 2016, and
November 2017 IEPs were untimely.  Dkt. 29-1 at 22.  Significantly, Plaintiffs gave ground,
asserting that they "no longer contest" that ruling.  *Id.*  Instead, they argued that "notwithstanding
the date on which a plaintiff 'knew or should have known' of a school district's . . . violations of
[the] IDEA (a.k.a. the 'KOSHK' date), the plaintiff can always seek relief for any injuries that
fall within the two-year period before the filing of the [d]ue [p]rocess complaint." *Id.* at 20
(emphasis removed).  Echoing that point, Plaintiffs frame their objections to the R&R as follows:
The R&R's refusal to consider the adequacy of the November 2017 IEP on the ground that "it
was drafted more than two years before the filing of the [d]ue [p]rocess [c]omplaint" constituted
"reversible error," because at least a portion of "the educational harm . . . caused" by the
defective IEP occurred "within the two-year period before filing of the [d]ue [p]rocess
[c]omplaint." Dkt. 44 at 5.

Although the basis for Plaintiffs' statute of limitations argument is unclear even at this
late date in the litigation, the Court can discern two possible theories.  First, Plaintiffs might be
arguing that, even when the violation of the IDEA that forms the basis for a due process

complaint occurred more than two years before the KOSHK date, a student and her family are still entitled—as a matter of law—to recover for any educational harm that occurred within two years of the KOSHK date.  Second, they might be arguing that the violation at issue here is not merely the inadequacy of the IEPs but also, and more fundamentally, the denial of a FAPE, and a violation of that type occurs—and reoccurs—each and every day a student suffers educational harm, even when that educational harm is the product of an inadequate IEP.  As explained below, the Court concludes that the first of these theories fails on the law and that second fails on the facts of this case.

The confusion that underlies Plaintiffs' argument might stem, at least in small part, from the statutory text, which itself is not a model of clarity.  Two subsections of the IDEA address the governing timeline.  Of the two provisions, 20 U.S.C. § 1415(f)(3)(C) is the more straightforward.  It provides: "A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(f)(3)(C).  So far, so good.  The IDEA establishes a two-year statute of limitations, subject to a discovery rule.  The second provision, 20 U.S.C. 1415(b)(6), however, introduces some fog to this clarity.  It recognizes "[a]n opportunity for a party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," and, as relevant here, directs that such a complaint must:

> set[] forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint . . . , in such time as the State law allows . . . .

20 U.S.C. § 1415(b)(6)(B).  Thus, § 1415(f)(3)(C) establishes a forward-looking statute of

limitations—that is, the parent or public agency may file a complaint within two years of the

KOSHK date, while § 1415(b)(6)(B) appears to establish a backward-looking limitation—that is,

the due process complaint may not include any alleged violation that occurred more than two

years before the KOSHK date.  *See G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 610

(3d Cir. 2015) ("Unlike § 1415(f)(3)(C), however, § 1415(b)(6)(B)'s two-year limitations period

runs backwards instead of forward from the reasonable discovery date.").

      This arguably competing language has engendered a range of interpretations: some courts

have construed the provisions "to limit redress to the two years preceding the complaint" (the

occurrence rule); "[s]ome have interpreted them to impose a filing deadline but not to limit the

remedy for timely-filed claims" (the discovery rule); and some have construed the provisions in

tandem to "extend [the period for which relief is possibly available] from two years before the

reasonable discovery date through the date the complaint was filed, which could be up to two

years after the reasonable discovery date" (the 2+2 rule).  *Id.* at 607, 610 (emphasis omitted).

      The three circuits that have wrestled with this question—the First, Third, and Ninth—

have all soundly rejected the occurrence and 2+2 rules; have treated § 1415(f)(3)(C) as

controlling; and have concluded that "[t]o the extent that some of [the language in

§ 1415(b)(6)(B)] appears to conflict with that conclusion, . . . the inconsistent language reflects

nothing more than a drafting error in the reconciliation process."  *Id.* at 625; *see also Avila v.*

*Spokane Sch. District 81*, 852 F.3d 936, 944 (9th Cir. 2017) ("We hold the IDEA's statute of

limitations requires courts to apply the discovery rule without limiting redressability to the two-

year period that precedes the date when 'the parent or agency knew or should have known about

the alleged action that forms the basis of the complaint.'" (quoting 20 U.S.C. § 1415(f)(3)(C)));

*Ms. S. v. Reg'l Sch. Unit 72*, 916 F.3d 41, 50 (1st Cir. 2019) ("We hold that the IDEA has a single two-year statute of limitations regulating the amount of time to file a complaint after the reasonable discovery date.  In holding this, we join the Third and Ninth Circuits.").  The reasoning in those opinions is convincing, and the Court need not repeat what they have already explained.

Here, moreover, the parties do not dispute that § 1415(f)(3)(C) establishes a two-year statute of limitations, and, at least at times, Plaintiffs seem to embrace the Third Circuit's decision in *G.L.  See, e.g.*, Dkt. 29-1 at 20.  At other times, however, Plaintiffs seem to revert to a version of the debunked 2+2 rule, premised on the mistaken understanding that § 1415(b)(6)(B) speaks to the remedies a plaintiff can seek for a violation of the IDEA, *see G.L.*, 802 F.3d at 615 (explaining that one possible, though incorrect, reading of § 1415(b)(6)(B) is that it "effectively serv[es] as a four-year remedy cap")*.*  In both their objections to the R&R and in their summary judgment briefing, Plaintiffs argue that they are entitled to recover for the educational harm that Edward allegedly sustained during the first few months of the 2018–2019 school year because, even though the November 2017 IEP remained in effect at the time, and even though they did not challenge *that* IEP within two years of the KOSHK date, the 2017 IEP nonetheless caused Edward harm during the "the two-year period before the filing of the [d]ue [p]rocess [c]omplaint."  Dkt. 44 at 5; *see also* Dkt. 29-1 at 20–21.  To the extent Plaintiffs mean to argue that § 1415(b)(6)(B) permits a parent to recover for all educational harm caused during the two-years preceding the filing of a due process complaint, regardless of whether that harm was caused by an action that was timely challenged in the due process complaint, they are mistaken.

The problem with that argument (if, in fact, Plaintiffs intend to make it) is that it impermissibly seeks to decouple § 1415(b)(6)(B) and § 1415(f)(3)(C).  All agree that

§ 1415(f)(3)(C) imposes a two-year statute of limitations, subject to the discovery rule. Importantly, that statute of limitations is tied to the date when the parent "knew or should have known about the alleged action that forms the basis of the complaint." Thus, to apply this rule, the hearing officer or the court must first identify "the alleged action that forms the basis of the complaint," and must then ask whether the parent requested a due process hearing within two years of when she knew or should have known about *that* action.

Section 1415(b)(6)(B) does not change that rule. As the Third Circuit persuasively explained in *G.L.*, § 1415(b)(6)(B) does not resurrect an untimely challenge but, rather, merely summarizes the procedurals rules "more fully described in later subsections," including § 1415(f)(3)(C). *G.L.*, 802 F.3d at 616. It bears emphasis, moreover, that the language that Congress employed in § 1415(f)(3)(C) parallels the language it used in § 1415(b)(6)(B). Section 1415(b)(6)(C) does not address "remedies" or "educational harm." To the contrary, like § 1415(f)(3)(B), it addresses when a parent may "present a complaint," and, like § 1415(f)(3)(B), it ties that determination to the "violation" or "action" challenged in the complaint. Reading the words that Congress used in § 1415(b)(6)(B) and § 1415(f)(3)(C) in "context and with a view to their place in the overall statutory scheme," *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989), it is evident that both provisions refer to the same "alleged action" or "alleged violation;" neither addresses "remedies" or "educational harm" unmoored to the specific "action" or "violation" alleged in the due process complaint, and neither permits a hearing officer or court to remedy an "action" or "violation" that was not timely asserted in that complaint. Accordingly, to the extent Plaintiffs intend to give § 1415(b)(6)(B) some independent remedial force that extends beyond § 1415(f)(3)(C) and that permits a parent to

recover for educational harm caused by a violation that was not timely raised in the due process complaint, that argument fails as a matter of law.

Alternatively, and somewhat more plausibly, Plaintiffs might be understood to press a factual argument—that is, they might simply intend to argue that the "violation" or "action" that formed the basis for their due process complaint was not simply the issuance of the IEPs (and the exclusion of certain types of instruction or therapy in those IEPs) but also, more generally, the denial of the FAPE that Edward would have received but for those omissions.  The problem with this argument, however, is that it ignores what Plaintiffs' due process complaint actually says, and it ignores the agreed-upon statement of issues, which provided the foundation for the hearing officer's disposition of the DCPS's statute of limitations motion.

As an initial matter, it is helpful to bear in mind what a FAPE is.  The IDEA defines a "free appropriate public education"—or FAPE—to mean "special education and related services that—

> (A)  have been provided at public expense, under public supervision and direction, and without charge;
>
> (B)  meet the standards of the State educational agency;
>
> (C)  include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D)  are provided in conformity with the individualized education program required under section 1414(d).

20 U.S.C. § 1401(9).

It follows that the denial of a FAPE can take a variety of different forms.  If the education is not "provided at public expense," or "under public supervision and direction" or does not "meet the standards of the State educational agency," for example, the student is denied a FAPE.  And, similarly, if the student does not receive an adequate IEP or if she does not receive services

and therapy in the manner prescribed by the IEP, she is denied a FAPE.  These are all distinct requirements, which must be considered separately.

"The key inquiry regarding an *IEP's* substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student progress."  *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018) (emphasis added).  That inquiry requires the reviewing court to consider the adequacy of a series of IEPs "as of 'the time each IPE is created' rather than with the benefit of hindsight."  *Id.* (citation omitted).  It follows that a challenge to the adequacy of an IEP differs from a challenge to a state agency or school's failure to implement that IEP in the required manner—that is, the denial of a FAPE based, for example, on the failure of an IEP to include a program for occupational therapy differs from a denial premised on the state agency or school's failure to provide the student with the occupational therapy prescribed in the IEP.  In short, the denial of a FAPE is not a freestanding concept, which simply asks whether the student received the benefits of the IDEA, but rather requires the reviewing court to identify the requirement of the IDEA that the state agency or school failed to satisfy.

Here, Plaintiffs' due process complaint is clear: it alleges that the "DCPS denied [Edward a] FAPE and continues to do so *in failing to offer an appropriate IEP to meet his needs*."  Dkt. 18-1 at 7 (emphasis added).  Removing any doubt about "the alleged action[s] that form[] the basis of [this] complaint," 20 U.S.C. § 1415(f)(3)(C), Plaintiffs then identify the specific IEPs at issue and identify a series of "deficiencies" in those IEPs, Dkt. 18-1 at 3.  Those deficiencies include "[a] dramatic decrease in speech/language therapy services" authorized by the IEP; an increase in "time spent outside general education;" a reduction in the authorized "occupational

therapy service hours" in the IEPs; the IEPs' identification of "[g]oals and objectives that do not

align with [Edward's] needs;" the IEPs "[f]ailure to appropriately address significant needs in

self-advocacy;" and their "[f]ailure to offer meaningful, research-based specially designed

instruction." *Id.* at 3–4. Each "basis of the complaint" focuses on the inadequacy of the IEPs

themselves, and none addresses questions of implementation, funding, or intervening events.

At the prehearing conference, moreover, Plaintiffs agreed to the following description of the

issues raised in the due process complaint: "Did Respondent fail to offer the Student an

appropriate Individualized Education Program ('IEP') in or about June[] 2018, December[]

2016, November[] 2017, November[] 2018, and November[] 2019." Dkt. 19-4 at 45 (A.R.

1015). It was on the basis of that characterization of Plaintiffs' own due process complaint that

the hearing officer resolved the DCPS's statute of limitations motion, and Plaintiffs remain

bound by the agreed-upon description of the basis of the complaint.

Perhaps Plaintiffs mean to argue that they did not know and should not have known that

the November 2017 IEP was inadequate until "after watching their child suffer from an IEP that

his educators incorrectly claimed was appropriate" during the first few months of the 2018–2019

school year. Dkt. 44 at 6. But that argument fails at the outset, since Plaintiffs have conceded

the point in their summary judgment brief, where they wrote:

> In an Order dated September 4, 2020, [the hearing officer] found that the [know-
> or-should-have-known] date on which Parents knew or should have known that
> DCPS was denying Edward FAPE was the date of development of each IEP
> itself. This amounted to an implicit ruling that the Family's due process
> complaint was untimely, a ruling that Parents no longer contest; therefore, only
> violations of FAPE in the two-year period prior to the due process complaint of
> June 19, 2020 are raised in this appeal.

Dkt. 29-1 at 21–22 (citations omitted).  In short, Plaintiffs do not challenge the hearing officer's determination that they knew or should have known about the inadequacy of the IEPs on the dates each IEP was formulated.

That concession, moreover, is well taken.  The hearing officer began his statute of limitations decision by explaining that the KOSHK standard requires hearing officers a "fine-grained" consideration of factors to determine "on a case-by-case basis" when the parents knew or should have known about the action that is the basis of the complaint.  Dkt. 19-4 at 56 (A.R. 1026) (quotations omitted).  Applying that approach, the hearing officer pointed to evidence, primarily from 2016, that indicated that Plaintiffs had reason to know that Edward was facing significant challenges in school and the types of services he required to advance.  Dkt. 19-4 at 57–60 (A.R. 1027–30).  He also noted that Edward's mother had been in nearly daily contact during the relevant period with a special education advocate.  *Id.* at 58.  And even if the hearing officer's analysis fell short, *cf. Damarcus S. v. District of Columbia*, 190 F. Supp. 3d 35, 45 (D.D.C. 2016) ("Certainly, there are some deficiencies that can be recognized immediately by a layperson when an IEP is created.  But the [h]earing [o]fficer's blanket finding that all deficiencies should be immediately recognized puts too great a burden on parents, who often lack the knowledge to understand the complexities of educating disable children.  Instead, the inquiry should depend upon the particular deficiency asserted, and the parent's ability to recognize it." (citations omitted)); *Avila*, 852 F.3d at 941 (rejecting "a strict occurrence rule" for the IDEA's statute of limitations), Plaintiffs have failed to raise any such argument before this Court.

Finally, Plaintiffs might intend to argue that the failure of a state agency or school to provide a student with an adequate IEP gives rise to a continuing violation throughout the period

in which that IEP is in place.  They assert, for example, that denial of a FAPE is "a repeated injury where an injury occurs each day until the programming is fixed."  Dkt. 44 at 7.  On this theory, Edward was injured each day he received inadequate services pursuant to his 2017 IEP, including in the fall of 2018.  But this theory also faces procedural and substantive hurdles.  As an initial matter, the Court notes that the R&R concludes that Plaintiffs "disavow[ed] such a theory" in their motion for summary judgment, Dkt. 43 at 48, and Plaintiffs do not object to that portion of the R&R, *see* Dkt. 44 at 1–7.  Even more importantly, the theory once again makes one of two mistakes: it either (1) conflates the violation with the harm, or (2) conflates a challenge to the adequacy of an IEP with a challenge to its implementation.  With the respect to the former mistake, for all the reasons explained above, the statutory text is clear: the due process claim must be filed within two-years of the date the parent knew or should have known about "the alleged action that forms the basis of the complaint," and, here, the stated basis of the complaint was the inadequacy of the IEPs.  And, with respect to the latter mistake, as also explained above, Plaintiffs have challenged only the adequacy of the IEP, and they have not challenged its implementation.  Plaintiffs cannot make a claim in this Court without first having done so before the hearing officer, *see Pinto v. District of Columbia*, 938 F. Supp. 2d 25, 32 (D.D.C. 2013) ("[A] court cannot address an issue that was not first presented to the hearing officer." (quoting *Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 43 (D.D.C. 2006))), and each of the challenges that they raised before the hearing officer focused exclusively on the adequacy of the IEPs at the time they were adopted.  Nowhere in the proceedings before the hearing officer did Plaintiffs even gesture at a continuing violation theory of relief.  *See* Dkt. 21-7 at 62–81 (A.R. 1896–1915) (Plaintiffs' closing arguments in the due

process hearing); Dkt. 21-3 at 142–48 (A.R. 1473–79) (Plaintiffs' closing argument in the hearing on the statute of limitations).

In this respect, Plaintiffs' claims differ markedly from those in *B.B. by & through Catherine B. v. Delaware Coll. Preparatory Acad.*, 803 F. App'x 593 (3d Cir. 2020). In that case, the Third Circuit concluded that the plaintiff there did "not seek to sweep . . . expired claims into a single 'continuing violation,'" but instead "limited his request for relief to violations that took place from April 1, 2014 to September 2014, within 'the two-year time period' before filing the April 2016 due process complaint." *Id.* at 597 (quotation omitted). Significantly, in *B.B.*, and unlike in this case, the due process complaint was based, in relevant part, on specific violations that occurred within the statute of limitations. As the Third Circuit observed, B.B. alleged that during the two-year window before the due process claim was filed, the school allegedly "failed to issue a PTE to conduct certain testing of B.B.," "failed to provide B.B. transportation to access special education and services," and "still had not evaluated B.B., met to revise his IEP, or provided him [with] speech services." *Id.* B.B. identified each of those alleged actions as the basis of his due process complaint, and thus B.B.'s challenge to each alleged action was timely raised. *Id.* at 594–95, 97. Notably, the Third Circuit did not suggest that B.B. could also recover for any ongoing injuries caused by earlier violations, which were not timely challenged. Thus, if anything, *B.B.* cuts against Plaintiffs' argument here and establishes a model for how Plaintiffs might have, but did not, challenge violations of the IDEA separate and apart from the substantive adequacy of the IEPs themselves.[4]

---

[4] Plaintiffs also appear to argue that they are entitled to recover for the educational harm Edward suffered in the first three months of the 2018–2019 school year because, during that period, DCPS had a duty to revise Edward's IEP, which it did not do. Dkt. 44 at 5–6 (objecting to the R&R's conclusion that "[t]he triggering incident here is the creation of the IEP, not any failure to

Because Plaintiffs only challenge the inadequacy of the 2017 IEP itself—rather than any service provided to Edward in the first three months of 2018–2019 school year—the Court rejects Plaintiffs' argument that they suffered a distinct injury each time Edward received services pursuant to that IEP.  The Court, accordingly, is unpersuaded by Plaintiffs' objections to the R&R's analysis of their statute of limitations arguments.

## B.    Exhaustion

Next, Plaintiffs object to the R&R's conclusion that their "decision not to reply to an argument raised in DCPS's responsive brief"—namely, that they had failed to exhaust several arguments as to why Edward's IEPs were insufficient—"constitutes a concession."  Dkt. 44 at 9. The Court need not resolve that question because, even assuming that they did not concede the issue of exhaustion, their arguments fail in any event.

The R&R concludes that "several issues raised in Plaintiffs' briefing before this Court were not presented to the hearing officer," including (1) whether the DCPS "fail[ed] to conduct 'a functional behavioral assessment, any testing of emotional/behavioral/executive functioning, or any update of cognitive testing' in connection with the formulation of the 2019 IEP;" (2) whether the formulation of the IEPs was procedurally deficient because "Edward was not observed in his special education classroom as part of his triennial reassessment at the beginning of the 2019–2020 school year;" and (3) whether "the 2019 IEP was flawed because 'no general

---

revise the IEP at the beginning of the 2018–2019 school year," on the ground that "this assertion . . . is contrary to IDEA's statute and implementing regulations which mandate that a school district updates an IEP periodically when a child is not making 'expected progress,' if the IEP is not responsive to the child's needs, or 'to address . . . other matters'" (quoting first Dkt. 43 at 46–47, then 20 U.S.C. § 1414(d)(4)(A), and lastly 34 C.F.R. § 300.324(b))).  But Plaintiffs did not raise this argument in their due process complaint or to the hearing officer.  *See* Dkt. 21-7 at 62–81 (A.R. 1896–1915) (Plaintiffs' closing arguments in the due process hearing); Dkt. 21-3 at 142–48 (A.R. 1473–79) (Plaintiffs' closing argument in the hearing on the statute of limitations). It is therefore not exhausted and cannot be raised for the first time to this Court.

education teacher attended the [IEP] meeting.'"  Dkt. 43 at 54–55 (quoting Dkt. 29-1 at 39–40).

The R&R is correct with respect to each of these procedural challenges.

Plaintiffs' due process complaint identified six alleged deficiencies with Edward's IEPs,

none of which raised a procedural challenge to the formulation of the IEPs.  Dkt. 18-1 at 3–4

(A.R. 565–66).  The issues raised were as follows: (1) "[a] dramatic decrease in speech/language

therapy services, despite a noted lack of progress in pragmatic language skills;" (2) "[i]ncreasing

[Edward's] time spent outside general education without an accompanying increase in

programmatic supports to provide him with the research-based instruction needed to make

meaningful educational progress;" (3) "[c]utting occupational therapy services hours in half;" (4)

"[g]oals and objectives that do not clearly align with [Edward's] needs or present levels of

educational performance;" (5) "[f]ailure to appropriately address significant needs in self-

advocacy, social skills, pragmatic language, and functional academics;" and (6) "[f]ailure to

offer meaningful, research-based specially designed instruction."  *Id.*  Understandably, the

hearing officer limited his consideration to these issues.  Dkt. 15-1 at 4–43 (A.R. 4–43).

"[A]bsent a showing that exhaustion would be futile or inadequate, a party must pursue

all administrative avenues of redress under the [IDEA] before seeking judicial review under the

Act," *Douglass v. District of Columbia*, 605 F. Supp. 2d 156, 165 (D.D.C. 2009) (quoting *Cox v.

Jenkins*, 878 F.2d 414, 419 (D.C. Cir. 1989)), and a court "cannot address an issue that was not

first presented to the hearing officer," *Pinto*, 938 F. Supp. 2d at 32 (quoting *Roark*, 460 F. Supp.

2d at 43).  This exhaustion rule serves several important functions:  It prevents courts from

"substitut[ing] their own notions of sound educational policy for those of the school's

authorities," *Endrew F.*, 580 U.S. at 404, and, like other exhaustion rules, it "prevents courts

from interrupting the administrative process permanently; it allows the agency to apply its

specialized expertise to the problem; it gives the agency an opportunity to correct its own errors; it ensures that there will be a complete factual record for the court to review; and it prevents the parties from undermining the agency by deliberately flouting the administrative process," *Cox*, 878 F.2d at 419.

Although Plaintiffs object to the R&R's conclusion that they conceded the exhaustion issue in the course of the summary judgment briefing, they do not even attempt to show that they raised the alleged procedural deficiencies with Edward's IEP in the administrative process. Absent such a showing, the Court cannot reach the merits of these allegations, none of which appear in Plaintiffs' due process complaint.

The Court, accordingly, concurs with the R&R's determination that Plaintiffs have not exhausted these alleged procedural deficiencies with the IEPs at issue.

## C.   Expert Witnesses

Plaintiffs also object to the R&R on the ground that it "erroneously found that the [h]earing [o]fficer did not require [them] to present expert witnesses to prove their case." Dkt. 44 at 8. In support of this argument, Plaintiffs point out that "the [h]earing [o]fficer . . . mentioned four times in his opinion that [they] failed to call expert witnesses." *Id.* at 9. They argue that these repeated references to that omission demonstrates that the hearing officer "weigh[ed] the testimony of DCPS's witnesses over [their] witnesses" and that he did so on impermissible grounds. *Id.* In Plaintiffs' view, the hearing officer's focus on their failure to proffer any expert testimony shows that he misapplied the burden-shifting framework that governs in IDEA cases.

As explained above, if a parent or guardian of a child with a disability disagrees with the school about "what the child's IEP should contain," the IDEA gives the parents the right to file a

due process complaint.  20 U.S.C. § 1415(f).  Issues raised in the due process complaint are then submitted to an impartial hearing officer for resolution.  *Id.* § 1415(f)(3).  In the District of Columbia, when "there is a dispute about the appropriateness of the child's individual educational program," "the party requesting the due process hearing"—here, Plaintiffs—"shall retain the burden of production and shall establish a prima facie case."  D.C. Code § 38-2571.03(6)(A)(i).  "[T]he D.C. Code does not define 'prima facie case' or what would satisfy Plaintiffs' 'burden of production.'"  *W.S. v. District of Columbia*, 502 F. Supp. 3d 102, 120 (D.D.C. 2020).  But it is safe to say that the prima facie burden does not set a high bar.  *See Lemus*, 2023 WL 2645985 at *13.  "Generally speaking, a burden of production requires only that a party 'produce enough evidence . . . to justify sending the case to [a] jury.'"  *W.S.*, 502 F. Supp. 3d at 120 (quoting 21B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5122 (2d ed. Supp. 2020)).  Once a parent has satisfied her burden of production and established a prima facie case, the burden shifts and "the public agency shall hold the burden of persuasion."  D.C. Code § 38-2571.03(6)(A)(i).

Here, the hearing officer correctly described this framework before concluding (1) that Plaintiffs "did not present a prima facie case," and/or (2) that the DCPS "showed that its recommendations for [Edward] were appropriate."  Dkt. 15-1 at 26 (A.R. 26); *see id.* at 26–27, 35–36 (A.R. 26–27, 35–36) (reaching those conclusions with respect to Plaintiffs' argument that the IEPs were deficient because they reduced the amount of monthly speech-language pathology and occupational therapy consultation services Edward would receive relative to what was provided in Edward's 2017 IEP); *id.* at 29, 36 (A.R. 29, 36) (finding the same with respect to Plaintiffs' argument that the IEPs insufficiently described the research-based instruction he would receive); *id.* at 29, 37 (A.R. 29, 37) (same with respect to Plaintiffs' argument that the

IEPs did not adequately address his needs relating to self-advocacy); *id.* at 29–30, 38 (A.R. 29–30, 38) (same with respect to Plaintiffs' argument that the IEPs did not address his needs regarding functional academics); *id.* at 32, 39 (A.R. 32, 39) (same with respect to Plaintiffs' argument that the goals in the IEPs were repeated year after year and that some of those goals were not measurable); *id.* at 33, 40 (A.R. 33, 40) (same with respect to Plaintiffs' argument that the IEPs should have provided more services relating to social skills and pragmatic language skills).

In explaining his conclusions, the hearing officer did, at times, note that Plaintiffs had not proffered any expert testimony to support their case. *See id.* at 25 (A.R. 25) ("Petitioner did not present an expert witness in support of her position that [Edward] needed more speech-language pathology services than this IEP recommended."); *id.* at 28–29 (A.R. 28–29) ("[Plaintiffs] did not submit any document in support of the contention that [Edward]'s bruises were a function of his[] lack of self-advocacy skills.  Moreover, [Plaintiffs] did not call any witness, expert or otherwise, in support this contention that [Edward] needed self-advocacy help in November 2018."); *id.* at 35 (A.R. 35) ("Again, [Plaintiffs] did not call an expert witness to testify that [Edward] needed more speech-language pathology services than this IEP recommended.  And again, evidence in the record indicates that the entire CES program at DCPS is based on addressing a student's communication needs, including through the delivery of ABA instruction."); *id.* at 39 ("[Plaintiffs] also argued that the emotional, social, and behavioral goal relating to [Edward]'s picking behavior was difficult to measure.  However, there is no testimony or evidence in the record to suggest that a special education teacher would have a problem measuring such goals, since [Plaintiffs] failed to call an expert witness to support her position on this issue.").

But he merely did so in the broader context of explaining why the evidence, as a whole, did not support Plaintiffs' arguments.  With respect to Plaintiffs' argument that the amount of time Edward spent each month receiving speech pathology services outside of the CES classroom should not have been reduced, for example, the hearing officer began by noting that Plaintiffs did not present expert testimony to make their prima facie case and instead "relied on the language in [Edward's] IEP, which did indicate that [Edward] presented with a decreased ability to comprehend verbally-presented information of length and complexity."  *Id.* at 25 (A.R. 25).  The hearing officer went on to explain, however, that other evidence in the record supported the school's decision to reduce those hours.  Specifically, the prior written notice for the 2018 IEP "indicated that the team recommended two hours of speech [pathology] per month because [Edward] required less cueing, it did not seem beneficial for him[] to continue working on the same challenges, and pulling him[] out was a detriment."  *Id.* at 26 (A.R. 26).  And the hearing officer noted that the only witness "with expertise" to testify on this subject found the amount of time in the IEPs to be appropriate.  *See* Dkt. 21-6 at 14 (A.R. 1787) (Lesa Gibson Testimony) ("[Edward] has problems focusing, and he had poor social language skills. . . [a]nd inside of his class, the social skills can be addressed."); *id.* at 15 (A.R. 1788) (Lesa Gibson Testimony) ("Many times with social language skills, we will pull them out and work on these things in the classroom with made-up scenarios.  Sometimes it works, sometimes it doesn't.  Because it's so hard for [Edward] to focus, he would not listen to [] scenario[s].  He would have to be in the classroom to really act it out[.]").

Plaintiffs failed to rebut this evidence, either on cross-examination or by proffering their own expert witness.  *See* Dkt. 15-1 at 25 (A.R. 25) ("Petitioner did not present an expert witness in support of her position that [Edward] needed more speech-language pathology services than

this IEP recommended.").  And while Edward's mother testified to her belief that his speech pathology hours should not have been reduced, her main criticism was ultimately unpersuasive. She simply argued, "if [the school] say[s] he's having a hard time with his social skills, why [is the school] decreasing the hours," Dkt 21-3 at 54 (A.R. 1385), to which the DCPS responded by explaining that "pull-out" services had not worked with Edward given his challenges focusing and that it anticipated that "push-in" services would be more effective, Dkt. 21-6 at 14 (A.R. 1787); Dkt. 17-1 at 6 (A.R. 428).  Based on this testimony, the hearing officer concluded that the evidence supported the DCPS's conclusion that the level of speech pathology services in Edward's IEPs was sufficient and, accordingly, that Plaintiffs had not met their burden of production, or, alternatively, that the DCPS had met its burden of persuasion.   In other words, the hearing officer concluded that Plaintiffs' argument failed, not because they failed to present *expert* testimony, but because they failed to offer any testimony or evidence controverting the reasoned explanation that the DCPS gave for the reduction of services.

The same can be said of the other instances in which the hearing officer noted the lack of expert testimony in Plaintiffs' case.  *See, e.g.,* Dkt. 15-1. at 28 (A.R. 28) ("Again, [Plaintiffs] did not call any witness or submit any document to support her view that the IEP needed to include language requiring research-based programming or instruction."); *id.* at 30 (A.R.) ("There is no testimony from any other witness to contradict [a specific witness]'s position on this issue."); *id.* at 37 (A.R. 37) ("Again, there is unrebutted testimony in the record that [Plaintiffs] expressly declined direct behavioral support services, which could have addressed [Edward]'s self-advocacy needs.").  When placed in context, the hearing officer's decision can hardly be read as requiring Plaintiffs to have retained experts; to the contrary, his references to the lack of expert testimony was merely one facet of his review of the record as a whole.

The Court, accordingly, is unpersuaded by Plaintiffs' objections to the R&R's sound

conclusions regarding the proper allocation of burdens and the absence of expert testimony.

**D.      Sufficiency of the 2018 & 2019 IEPs**

Plaintiffs' final objections focus on the adequacy of the November 2018 and November

2019 IEPs.  Plaintiffs had argued to the hearing officer that these IEPs were inadequate because

they (1) did not adequately describe the research-based instruction that Edward would receive,

(2) failed to include measurable goals, and (3) resulted in regressions in Edward's performance.

Dkt. 18-1 at 2–3 (A.R. 565–66).  The hearing officer rejected each of these arguments, Dkt. 15-1

at 26–39 (A.R. 26–39), and the R&R agrees, Dkt. 43 at 56–61, 62–65, 66–69.  For the reasons

that follow, the Court again finds no error with either hearing officer's or the R&R's analysis.

1.      *Unmeasurable goals*

The Court begins with Plaintiffs' cryptic objection to the R&R's analysis regarding

unmeasurable goals.  That objection asserts as follows:

> The R&R claims that the Family did not prove a FAPE denial because they could
> not identify any deficiencies with the offered IEP.  R&R [at] 62.  [That] holding
> is factually erroneous.   [The R&R] states that Edward's goals were not
> measurable (*Id.* at 68).   Thus, the finding that the Family failed to identify
> deficiencies in the IEP is refuted by the R&R's own observations.

Dkt. 44 at 8.  Plaintiffs misunderstand the R&R.  Rather than finding that the IEPs contained

goals that were *not* measurable, it found just the opposite.  The R&R walks through each of the

goals that Plaintiffs attacked as immeasurable, and, as to each, the R&R rejects Plaintiffs'

argument.  To be sure, the R&R does observe that "[t]he adaptive/daily living goal [was] . . .

vaguer" than the others, but it also explained that "'goals for social skills . . . are inherently more

difficult to quantify' than for academic skills" and that, accordingly, "some leeway should be

granted when assessing their adequacy."  Dkt. 43 at 68 (citation omitted).  The R&R then

concludes that the hearing officer reasonably found that the record did not support Plaintiffs' claim that a trained professional would be unable to "manag[e]" this goal.  *Id.*

It was only after concluding that each of these goals was measurable that the R&R noted that, even "*assuming* that any or all of these goals were insufficient under the IDEA, Plaintiffs still would not prevail on this issue."  Dkt. 43 at 68 (emphasis added).  That alternative holding did not give rise to the inconsistency in the R&R that Plaintiffs posit.  Indeed, if anything, this alternative holding further undermines Plaintiffs' challenge to the R&R, since Plaintiffs fail to take issue with this independent basis for upholding the hearing officer's decision with respect to the measurability of the goals contained in the IEPs.

To the extent Plaintiffs intend to go a step further and to object to the R&R's underlying conclusions regarding the measurability of the goals in Edward's IEPs, that argument is not properly raised.  To object to a magistrate judge's R&R, a party must "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for the objection."  L. Civ. R. 72.3(b).  "[O]nly those issues that the parties have raised in their objections to the Magistrate Judge's report will be reviewed by this court."  *Aikens v. Shalala*, 956 F. Supp. 14, 19 (D.D.C. 1997).  Here, Plaintiffs have failed to provide any basis for their objections, beyond their mistaken assertion that the R&R takes inconsistent positions with respect to measurability.  "[S]uch indiscriminate objections are not properly before the Court." *Shurtleff*, 991 F. Supp. 2d at 20; *see, e.g.*, *id.* at 14 n.4 ("These cursory references, which merely refer the reader to arguments already made to and considered by the Magistrate Judge, are not 'properly objected to' and are therefore not entitled to de novo review."); *cf. Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) ("We need not consider cursory arguments made only in a footnote."); *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009)

(Williams, J., concurring) ("[J]udges 'are not like pigs, hunting for truffles buried in briefs' or the record." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

The Court, accordingly, rejects Plaintiffs' first challenge to the adequacy of the November 2018 and November 2019 IEPs.

2.      *Research-based instruction*

Plaintiffs next argue that the IEPs were deficient because they "did not contain research-based instruction" and that both the hearing officer and the R&R erred in failing to recognize this deficiency. Dkt. 44 at 7. The IDEA mandates that a child's IEP include "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Plaintiffs argue that this means that an IEP must "supply a minimal description of the research-based instruction that the student will be receiving" and that Edward's IEPs fail this test. Dkt. 29-1 at 29.

In considering this argument, the hearing officer withheld judgment on its merits. Instead, he concluded that, even if Edward's IEPs lacked a detailed description of the research-based instruction that Edward would receive, Plaintiffs' challenge would still fail (1) because they failed to "explain how the lack of this language caused the [s]tudent any harm," and (2) because "the record suggests that the Student did receive a considerable amount of instruction based on the educational methodologies at [Deal Middle School]." Dkt. 15-1 at 28 (A.R. 28). As explained below, the R&R agrees, Dkt. 43 at 56–59, as does the Court.

The R&R first explains that, even if one assumes that a failure adequately to describe the research-based education a student will receive in an IEP violates the IDEA, that failure would constitute a procedural violation. *Id.* at 57. That matters for present purposes, the R&R further

explains, because a plaintiff is entitled to relief based on a procedural violation of the IDEA only if "he or she [can] show some ensuing harm, such as a deprivation of educational benefit," *id.*, and here, the hearing officer found no such harm.  Finally, the R&R concludes, because "Plaintiffs have not provided sufficient reason to undermine the deference due to the hearing officer's treatment of the evidence on this point," his conclusion must stand.  *Id.* at 59.

Plaintiffs disagree.  Dkt. 44 at 7.  They contend that such a conclusion "is not supported by the record." *Id.*  For support, they point to the testimony of Annie Mengistu, Edward's special education teacher at Deal Middle School for the 2018–2019 school year (until he was transferred to Hardy Middle School in late February or early March 2019). *Id.*  They assert:

> Special education teacher Annie Mengistu testified that she gathered her curriculum from different disparate programs, and that it was all teacher-created. AR 1607–1608, 1613–1615.  She could not state how long she spent on reading each day.  AR 1613.  Nor could she testify as to any training she had received in Applied Behavior Analysis ("ABA"), which DCPS pointed to as, and the Hearing Officer found was, the research-based instruction that Edward purportedly received.  When asked, she testified that she had had no specific ABA training other than from DCPS—but she could not remember anything about those DCPS trainings, including when taken or what they involved. AR 1621.

*Id.*  In Plaintiff's view, this testimony shows that "the IEP did not include research-based instruction and the student's primary special education teacher could not recall being trained in ABA." *Id.*

As an initial matter, the Court agrees with the framework that the hearing officer and the R&R applied.  "A procedural violation of the IDEA is not a *per se* harm leading inexorably to a finding of denial of a FAPE." *J.T. v. District of Columbia*, 496 F. Supp. 3d 190, 203 (D.D.C. 2020).  Rather, "an IDEA claim is viable only if those procedural violations affected the student's substantive rights." *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006) (emphasis removed).  Accordingly, "'in matters alleging a procedural

violation,' a student has been denied a FAPE 'only if the procedural inadequacies impeded the child's right to a free appropriate public education; significantly impeded the parent's opportunity to participate in the decision[-]making process regarding the provision of a free appropriate public education to the parent's child; or caused a deprivation of educational benefit.'" *J.T.*, 496 F. Supp. 3d at 203 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

Here, Plaintiffs object only to the R&R's conclusion that the hearing officer correctly rejected their research-based-instruction challenge on the ground that they had failed to demonstrate that Edward had suffered any related educational harm.[5]  Dkt. 44 at 7.  More specifically, Plaintiffs object only to that determination with respect to the education Edward received in the 2018–2019 school year; they cite no evidence respecting the hearing officer's determination regarding the 2019–2020 school year.

The hearing officer's no-harm determination for the 2018–2019 school year rested on the finding that Edward had, in fact, received research-based instruction at Deal Middle School.  In support of that finding, the hearing officer pointed first to testimony showing that the DCPS

_____

[5] In their earlier summary judgment briefing, Plaintiffs argued that the alleged procedural violation "significantly impeded [their] opportunity [as parents] to participate in the decision-making process regarding the provision of a [FAPE]."  20 U.S.C. § 1415(f)(3)(E)(ii).  They argued that "Edward's IEPs have never contained a statement of the special education, related services, and supplementary aids and services based on peer-reviewed research that would give Parents sufficient information to know what program DCPS would actually provide to Edward and therefore to be able to monitor that program and hold it accountable.  Without that information, Parents lacked any meaningful notice of the program proposed and could not meaningfully participate and contribute input regarding that program."  Dkt. 29-1 at 29–30 (citations omitted).  The R&R, however, did not address this type of harm, and Plaintiffs have not objected to that omission.  Fed. R. Civ. P. 72(b)(3) ("[A district court only] determine[s] de novo any part of the magistrate judge's disposition that has been properly objected to.");  *Thomas v. Arn*, 474 U.S. 140, 150–51 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions under, a *de novo* or any other standard, when neither party objects to those findings.").  The issue, accordingly, is not before the Court.

generally "provides instruction through the ABA methodology" in all of its CES classrooms. Dkt. 15-1 at 28 (A.R. 28). Neither party disputes that the ABA methodology constitutes research-based instruction. The hearing officer also credited Mengistu's testimony that Edward received research-based instruction at Deal Middle School, including her testimony that "the CES classroom[] . . . used the Edmark program" and "used the Lexia and Unique programs." *Id.* Plaintiffs do not dispute that these programs constitute research-based instruction. Plaintiffs nevertheless challenge the reasonableness of the hearing officer's determination.

They contend that the hearing officer was wrong to conclude that Edward received ABA-based instruction because Mengistu could not "testify as to any training she had received in . . . ABA." Dkt. 44 at 7. If she could not testify to any training she received about ABA, Plaintiffs question how she could possibly have provided that instruction to Edward. But Mengistu later clarified that she had not "received any specific ABA training" "*[o]ther than DCPS trainings*" (although she could not specify exactly *when* that training occurred). Dkt. 21-4 at 130 (A.R. 1621) (emphasis added). And she testified that she has a master's degree in education and has been a certified special education teacher for sixteen years. *Id.* at 134–35 (A.R. 1625–26). Based on this testimony, the hearing officer reasonably determined that Mengistu was familiar with the ABA program.

That determination, moreover, is reinforced by other evidence in the record showing that DCPS generally uses ABA methodology in its CES classrooms, including at the schools Edward attended. For example, Arielle Alphonse, the LEA representative at Deal Middle School who met frequently with Mengistu about the special education program at the school, testified that a Board Certified Behavior Analyst ("BCBA") would visit the CES classrooms at Deal every week to provide support with the ABA instruction. Dkt. 21-5 at 107, 110, 119 (A.R. 1742, 1745,

1754).  The BCBA would "manag[e] th[e] binder" that each CES teacher had that "contained data that aides and teachers took on different goals that students would work on."  *Id.* at 119 (A.R. 1754).  Mark Walker, a "specialist with the autism team [at] DCPS" who worked with all CES classrooms, including Edward's, provided further explanation regarding the binder.  Dkt. 21-7 at 34, 46–47 (A.R. 1868, 1880–81).  He testified that "we provide . . . an ABA binder for every kid" and that "in that binder, we provide . . . behavior samples, token economies, snapshots, behavior snapshots, and the techniques that are implemented to improve every student's performance."  *Id.* at 46–47  (A.R. 1880–81).  The binder is "filled with instructional methodology, interventions, and responses" so the teacher can see "how they're progressing" and "it's all based on ABA principles."  *Id.* at 47 (A.R. 1881).

After weighing all this, the hearing officer made the factual determination that Edward did receive research-based instruction.  As the R&R concluded, that determination was premised on uncontroverted evidence and was well reasoned, and it is entitled to deference.  *See J.T. v.*, 496 F. Supp. at 207 ("[T]he hearing officer is best positioned to make credibility judgments as to testifying witnesses and resolve factual disputes that amount to inconsistent testimony."), *aff'd*, No. 20-7105, 2022 WL 126707 (D.C. Cir. Jan. 11, 2022).[6]

---

[6] To the extent that Plaintiffs take issue with Mengistu's testimony that she used other research-based programs in her classroom, *see, e.g.*, Dkt. 21-4 at 117 (A.R. 1608) (Megnistu testifying that the "program she used with [Edward] for his word readings goals" was "Lexia"); *id.* at 122–23 (A.R. 1613–14) (Mengistu testifying that for math, she used "i-Ready," which is "an assessment program" that "also designs a curriculum based on student levels"), it is hard to see how that undermines the hearing officer's conclusion that Edward received ABA-based instruction.  If anything, this evidence would seem to suggest that Edward received more, not less, research-based instruction and thereby did not suffer an educational harm, and Plaintiffs advance no argument to the contrary.

Accordingly, the Court agrees with the R&R that Plaintiffs have failed to show that Edward was denied a FAPE because his IEPs did not adequately describe the research-based instruction he would receive.[7]

3.    *Regression*

Finally, Plaintiffs object to what they characterize as the R&R's "hold[ing] that regression is irrelevant to a denial of [a] FAPE."  Dkt. 44 at 8 (citing Dkt. 43 at 62).  Significantly, this objection is not addressed at the *implementation of the IEPs* at issue.  Rather, Plaintiffs argued at the due process hearing that the repetition of goals in the November 2018 and November 2019 IEPs from goals included in earlier IEPs constituted prima facie evidence that the 2018 and 2019 *IEPs were deficient* and that Edward's lack of progress in 2018 and 2019 confirms that supposition.  In Plaintiffs' view, the mere repetition of goals showed "that Edward was either not progressing or regressing, thereby establishing that the IEPs were not 'reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances.'"  Dkt. 43 at 62 (quoting *Endrew F.*, 137 S. Ct. at 999).

In response, the R&R explains that "the question is not so simple," and notes that "Courts have consistently underscored that the 'appropriateness of an IEP is not a question of whether it will guarantee educational benefits, but rather whether it is reasonably calculated to do so.'"  *Id.* (quoting *Moradnejad*, 177 F. Supp. 3d at 275).  In the magistrate judge's view, moreover, this is such case because the hearing officer "ultimately found," in light of "unrebutted testimony from Edward's special education teachers," that the IEPs were "reasonably calculated to enable

---

[7] In their objections to the R&R, Plaintiffs do not argue that the R&R failed to consider whether the hearing officer factored Edward's regression (or lack of progress) into his determination that Edward suffered no harm from any failure by DCPS to provide Edward with an IEP that stated with adequate specificity the research-based instruction he would receive.  Accordingly, the Court does not consider whether the hearing officer's decision erred in this manner.

Edward to make educational progress considering his unique circumstances." *Id.* at 63.  Because the magistrate judge found the hearing officer's assessment of the record to be "well-supported," the R&R accords it deference and concurs with the hearing officer's conclusion that Plaintiffs had not shown Edward's IEPs to be insufficient. *Id.*  Plaintiffs take issue with this analysis, arguing that they have shown that the 2018 and 2019 IEPs were inadequate because, among other reasons, Edward regressed in the 2018–2019 and 2019–2020 school years.  Dkt. 44 at 8.

As an initial matter, the Court notes that the hearing officer's decision did, in fact, take note of Edward's lack of progress.  The decision explained: Plaintiffs' "claims [are] largely based on the contention that [Edward] did not make enough progress . . . during the 2018–2019 and 2019–2020 school years," but they "fail[] to acknowledge . . . that the IDEA does not require that such a student must make the same kind of progress as a typically developing student."  Dkt. 15-1 at 41 (A.R. 41).  Rather, the hearing officer explained, "limited academic progress does not *ipso facto* signal a violation of the IDEA any more so than does the existence of substantially similar IEPs year over year."  *Id.* (quoting *J.B. by & through Belt v. District of Columbia*, 325 F. Supp. 3d 1, 9 (D.D.C. 2018)).

That statement of the governing law is correct.  The Supreme Court in *Endrew F. ex rel. Joseph F. v. Douglas County School District*, 580 U.S. 386 (2017), held that "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *id.* at 399.  To be sure, the Court rejected the argument that all that a school is required to offer a student in an IEP is "de minimis progress."  *Id.* at 402–03.  But the Court "did not hold that any time a child makes limited, or even zero progress, th[e] school system has necessarily failed to provide a FAPE and violated the IDEA."  *J.B.*, 325 F. Supp. 3d at 9 (emphasis omitted) (citing *Endrew F.*, 580 U.S. at 402–03).  Rather, the central question remains

"whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress." *Z.B.*, 888 F.3d at 524.  That standard "calls for evaluating an IEP as of the time each IEP was created rather than with the benefit of hindsight," though "evidence that 'post-dates' the creation of an IEP is relevant to the inquiry to whatever extent it sheds light on whether the IEP was objectively reasonable at the time it was promulgated." *Id.*

The hearing officer also correctly applied this standard in evaluating the evidence of Edward's regression, which consisted of the repetition of goals in Edward's IEPs overtime and his fluctuating test scores in several areas.  With respect to the repetition of IEP goals, the hearing officer noted that several of the goals in Edward's 2018 IEP and 2019 IEP were repeated from the year prior.  *See, e.g.*, Dkt. 15-1 at 30 (A.R. 30) (noting that Edward's 2018 IEP "did repeat the math goal relating to completing 'division expressions' with one prompt, which had been mastered by May 22, 2018 according to the progress report" from the school Edward attended prior to attending Deal Middle School); *id.* at 31 (A.R. 31) (noting that a 2018 IEP reading goal "related to writing a three-to-five-sentence summary of text with one prompt" had been repeated, though that "goal had not been mastered" at Deal Middle School); *id.* at 31 n.4 (A.R. 31) (noting that Edward's "adaptive/daily living skills goal relating to geography," the "communication/speech and language goals," and the "emotional, social, and behavior goal relating to social communication skills" were all repeated in his 2018 IEP, but Edward had not mastered any of these goals prior to attending Deal Middle School); *id.* at 38–39 (A.R. 38–39) (noting that a "written expression goal relating to writing compound sentences" had been repeated, but the "goal was only introduced in the middle of the [prior] school year and had not been mastered by [Edward] at the time of the [] 2019 IEP"); *id.* at 39 (A.R. 39) (noting that the

44

"motor skills/physical development goal" had also been repeated, but that it "also had not been mastered when the [] 2019 IEP was written").  But he also stressed that "most of the goals [in Edward's November 2019 IEP] were in fact new," *id.* at 38 (A.R. 38), and noted that Mengistu testified that Edward's November 2018 IEP contained goals from his prior IEP because (1) he had not yet mastered those goals, and (2) he had only been at Deal Middle School for a couple months and the school "wanted [him] to master the goals from his[] prior school before working on new goals."  *Id.* at 30–31; Dkt. 21-4 at 124–25 (A.R. 1616) ("I believe this goal came from the school that [Edward] came from. . . . Because he still hadn't mastered that goal. And the team agreed that we are going to continue working on that goal.  And being November, . . . it was only a few months since . . . [Edward] came to me, so at that point we hadn't worked on this particular goal to mastery.").

The hearing officer also credited the testimony regarding Edward's "severe memory issues," which causes him to "forget[] lessons previously learned" and requires him "to be taught the same thing over and over again to achieve mastery."  Dkt. 15-1 at 31 (A.R. 31).  The hearing officer, for example, cited to Mengistu's testimony that Edward's "progress is very gradual" and "[t]here [are] times that he may show progress and then may not retain it or may not be able to generalize that skill," which can make it "seem[] that . . . he is not progressing."  Dkt. 21-4 at 138 (A.R. 1629).  She also explained that because of this, "there's a lot of repetition of a particular skill" with Edward; although Edward may "master [a skill] . . . at a particular time," "[a]fter some time, that mastery may not be there."  *Id.*

Mengistu's account of Edward's "memory issues" were echoed in Walker's testimony, which the hearing officer also credited.  Among other things, Walker testified that Edward would have to repeat goals before lasting mastery could be achieved, which is "very typical" of children

45

with autism.  Dkt. 21-7 at 42 (A.R. 1876).  Walker further explained that, in educating children

with autism, "[w]e'll have many cycles up and down . . . because [autism] has to do with

memory and the access to memory."  *Id.*  Walker testified that Edward, in particular, "can do a

rote application of, let's say a math problem, and he could write it out and be perfect.  The very

next day, we could come back to that.  But the pathway is not as clear as it was the day before.

And so[,] he can't access it . . . again."  *Id.* at 42–43 (A.R. 1876–77).

  The hearing officer relied on this testimony to conclude that the repetition of goals in

Edward's IEP did not reflect a deficiency in the IEPs; to the contrary, in light of Edward's

"severe memory issues," which require him "to be taught the same thing over and over to

achieve mastery," Dkt. 15-1 at 30–33 (A.R. 30–33), the repetition of goals was "reasonably

calculated to enable [Edward] to make progress appropriate in light of [his] circumstances,"

*Endrew F.*, 580 U.S. at 399; *see also* Dkt. 15-1 at 39 (A.R. 39) ("Here, I find that the repetition

of [Edward]'s goals was a function of [Edward]'s low cognitive ability and memory issues,

which required frequent repetition of instruction.").  Plaintiffs fail to identify any evidence in the

record casting doubt on this account of how Edward learns.  Nor do they suggest that there are

techniques other than repetition that would have been "reasonably calculated" to enable Edward

to progress more effectively.  The Court, accordingly, is persuaded that the hearing officer's

weighing of the evidence was both sound and entitled to deference.  *Cf. Damarcus S.*, 190 F.

Supp. 3d at 53 n.7 ("This is not to say that repetition of goals from one IEP to the next is per se

inappropriate.  Rather, this wholesale, cut-and-paste repetition is symptomatic of a larger, more

concerning failure by the District to adapt its approach in the face of Damarcus's continued

frustration and lack of progress." (citation omitted)).

The hearing officer also considered the evidence that Edward had regressed because his tests scores in reading and math had not improved.  Although recognizing that some test scores "showed that [Edward had] made inconsistent progress, or no progress at all," the hearing officer observed that "the most recent psychological testing of [Edward] revealed that his[] scores increased in broad reading, broad mathematics, and broad written expression from 2016."  Dkt. 15-1 at 36 (A.R. 36); *see also id.* at 19–20 (A.R. 19–20) ("A speech and language assessment of [Edward] was conducted on October 31, 2020, November 13, 2020, and November 19, 2020. The corresponding report dated November 23, 2020, reported [Edward]'s scores. . . . On all the tests, [Edward] scored in the below average range in receptive and expressive language.  The evaluator indicated that [Edward]'s vocabulary and pragmatic skills were decreasing but that his[] language skills were increasing."); *id.* at 20 (A.R. 20) ("Another occupational therapy assessment of [Edward] was conducted on November 13, 2019, November 15, 2019, and November 20, 2019.  The corresponding report dated November 21, 2020, included testing on the BOT-2 and Beery VMI, as well as interviews with a teacher and [Edward]. . . . The evaluator remarked that [Edward] showed improvement from past testing on the BOT-2 but not on the Beery VMI.  The report indicated that [Edward] improved from 2016 testing in visual motor and gross motor subtests and made progress in organizational skills, typing skills, handwriting, and fine motor skills.  However, [Edward] still needed to generalize skills and his[] handwriting was inconsistent.").

Finally, the hearing officer credited the testimony from several witnesses, who explained that "test scores are not the best way to determine [Edward]'s progress."  *Id.* at 36 (A.R. 36). Walker, for example, testified that because autism is a "sensory disability, [and] it affects a person's ability to recall," "testing is . . . difficult for . . . students with autism."  Dkt. 21-7 at 42–

43 (A.R. 1876–77).  That was why, Walker further explained, Edward could present "at kindergarten level" on a "formal test" but present at a "first to second grade" level "in the classroom."  *Id.* at 43 (A.R. 1877).  Lesa Gibson, Edward's speech-language pathologist at Hardy Middle School, also testified that tests were not a particularly effective way to measure Edward's ability and did not "valid[ly] represent[] his functioning."  Dkt. 21-6 at 10 (A.R. 1783). She explained Edward "has a difficult time focusing"—"just because he couldn't stay focused for those tests doesn't mean that he doesn't know that."  *Id.* at 10–11 (A.R. 1783–84).  As a result, Gibson believes that Edward "know[s] way more than the test shows."  *Id.* at 11 (A.R. 1784).  That description of Edward's testing ability was echoed by Arden Matthew, the school psychologist at Hardy Middle School.  Matthew testified that Edward presented a "unique case where [he] had to actually redirect [Edward] maybe three to six times per item . . . on just about all of the subtests."  Dkt. 21-5 at 44 (A.R. 1679).  Accordingly, "more so [than] formal assessments," Matthew found "teacher observations are actually more helpful as far as just measuring his personal progress."  *Id.*

Based on all this testimony, the hearing officer found that "test scores are not the best way to determine [Edward]'s progress" and instead credited the IEP progress reports that stated that, notwithstanding the mixed picture in his test scores, Edward had made some progress in his goals.  Dkt. 15-1 at 36 (A.R. 36).  Although Plaintiffs dispute this conclusion, once again, they offer no controverting evidence and no reason to question the hearing officer's assessment of the record.  The Court, accordingly, is left with a well-reasoned administrative decision that is supported by the evidence in the administrative record.  Nothing more is required to sustain that decision.  *Jackson v. District of Columbia*, No. 19-197, 2020 WL 3318034, at *14 (D.D.C. June 2, 2020) ("The Hearing Officer here adequately considered, weighed, and explained a mixed

record in a manner that was consistent with the LRE requirement and the other requirements of the IDEA. 'Where evidence of educational appropriateness is mixed, and a court bases its ruling on same record as before the hearing officer, the court should defer to the hearing officer.'" (quoting *Schoenbach v. District of Columbia*, 309 F. Supp. 2d 71, 82 (D.D.C. 2004))).

The Court, accordingly, is unpersuaded by Plaintiffs' attack on Edward's November 2018 and November 2019 IEPs based on his failure to make greater progress over the years and the repetition of certain goals in those IEPs. *See also Shaw v. District of Columbia*, No. 17-738, 2019 WL 498731, at *19 (D.D.C. Feb. 8, 2019) ("[The IDEA] requires only that education services be tailored to a student's 'unique needs.' In some cases, a student's unique attributes may preclude her from achieving much more than de minimis academic progress. In those circumstances, the student's lack of progress does not prove that the school denied the student a FAPE." (emphasis omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' objections to the Magistrate Judge's Report and Recommendation are overruled, Dkt. 44, and the Court will **ADOPT** the Report and Recommendation, Dkt. 43, will **DENY** Plaintiffs' motion for judgment on the administrative record, Dkt. 29, and will **GRANT** Defendant's cross-motion for summary judgment, Dkt. 35.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 29, 2023